[File No. 6330.]

STATE OF NORTH DAKOTA ON THE RELATION OF P. O. SATIRE, Attorney General, Relator, v. THOMAS H. MOODIE and Walter Welford, Respondents.

(258 N. W. 558.)

Opinion filed February 2, 1935.

*P. O. Sathre,* Attorney General, and *Francis Murphy,* Special Assistant Attorney General, for relator.

*M. W. Murphy, M. A. Hildreth, John Moses, John F. Sullivan, W. D. Lynch* and *C. J. Murphy* for respondent Moodie.   *Alvin Strutz,* for respondent Welford.

BURKE, Ch. J. This is an original proceeding in quo warranto instituted in this court upon the application of the Attorney General. It involves the title to the office of Governor. In the information it is alleged that the respondent, Thomas H. Moodie, received a majority of the votes cast at the last general election for the office of Governor; that a certificate of election was duly issued to him, and that he has qualified and entered upon the discharge of his duties as Governor; and that the respondent, Walter Welford, at the same election, was elected Lieutenant Governor and that he has duly qualified as such officer. It is further alleged in the information that the said respondent, Thomas H. Moodie, did not possess the qualifications prescribed by § 73 of the state constitution and that he is ineligible to the office

of Governor in this: (1) That he is not a citizen of the United States; and (2) that he had not "resided five years next preceding the election within the state."

The respondent Moodie filed a return wherein he denied the averments of the information and asserted that he was and is a citizen of the United States and that he had resided within North Dakota the five years next preceding said general election and, hence, possesses the qualifications which the Constitution prescribes for the incumbent of the office of Governor.

The pleadings in the case presented questions of fact properly triable to a jury. This court, therefore, entered an order that:

"Whereas, in the above entitled action there are presented issues of fact which are properly triable to a jury,

"And, Whereas, the provision of the Constitution (North Dakota Constitution, § 87) conferring original jurisdiction upon the Supreme Court expressly provides that 'no jury shall be allowed in the Supreme Court but in proper cases questions of fact may be sent by said court to the district court for trial.' . . .

"It is ordered:

"1. That the issues of fact in this case be sent to the district court of Ramsey County for trial; that such issues of fact be tried to a jury, unless the parties expressly waive trial by jury, and the trial judge accepts such waiver and determines to try the case without a jury.

"2. That the Hon. C. W. Buttz, one of the judges of the Second Judicial District of North Dakota, whose chambers are located in said Ramsey County, be and he hereby is designated as the judge to preside at the trial of said action."

On January 21, 1935, Judge Buttz made the following report to this court: "January 7, 1935, Supreme Court made order in this case that issues of fact be sent District Court Ramsey County for trial designating me judge to preside at trial. I was notified of entry of order on same day. Shortly thereafter was informed that Attorney General might file application for change of place of trial. On same day I communicated with him requesting if such application were made it be presented promptly so that case might be tried as expeditiously as possible. In order to cause as little inconvenience as possible and to expedite disposition of case I arranged for hearing the application for

change of place of trial and conference with counsel for respective parties before January 14th. They were unable to agree. At that time counsel for both sides present at Fargo and application for change of place of trial was submitted by attorney general. Conformable to usual practice gave the opposing side opportunity until Saturday night to submit rebutting affidavits. At that time had not the slightest doubt that it would be possible to obtain fair and impartial jury either in Ramsey county or in any other county to which case might be transferred, if a change of place of trial were ordered. Both sides and myself have honestly tried to expedite trial. Not a moment was wasted. Careful consideration has led me to conclusion that county chosen by Supreme Court, namely Ramsey, is probably most impartial county and, consequently, I denied application for change of venue as it appeared to me that in all circumstances there is greater probability of obtaining a fair and impartial jury in Ramsey county than in any other county in state. However recently addresses have been broadcast over radio purporting to discuss not only all facts in case but procedure adopted. In many instances in such manner as to tend to discredit decision that may ultimately be reached. In similar instances discussions have appeared in press. According to press House of Representatives have discussed and passed resolutions looking toward impeachment of Governor Moodie for same reasons and grounds that are involved in this action. According to statements in press communications have been sent to members of legislative assembly from practically every section of state expressing opinions on very issues involved in this case. In short, there has been developed such intense feeling, dissension and turmoil as to render it difficult if not impossible to obtain fair and impartial jury in any county of state. In my opinion there is greatest likelihood that no jury would agree upon verdict; great probability is that disagreement will result. In short, it is my deliberate judgment that the conditions which have been brought about in this state the past week makes it highly probable that an attempt to try case to a jury would be wholly futile and merely involve needless expense and tend to prolong present state of uncertainty and turmoil. Therefore, am of opinion that ends of justice will be best served if case be returned to Supreme Court for final disposition."

Immediately after this report had been received by this court

counsel for the respective parties were informed and directed to appear. They did so appear. The report was duly considered and in open court counsel for the respective parties announced that they fully acquiesced in the report and that they waived trial by jury and requested the Supreme Court to try all issues in the case, both of law and of fact. The question, therefore, presented itself whether in the circumstances this court should try and determine the issues of fact in the case.

The primary function of this court is to exercise appellate jurisdiction, that is, to review on appeal the decisions rendered in the trial courts. Section 86 of the state constitution expressly so provides. It says that except as otherwise provided in the constitution, the supreme court shall have appellate jurisdiction only. In addition to the appellate jurisdiction the constitution grants to the Supreme Court a general superintending control over all inferior courts; and it also grants to the Supreme Court original and prerogative jurisdiction "to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction and such other original and remedial writs as may be necessary to the proper exercise of its jurisdiction" and authorizes the court to hear and determine the same. N. D. Const. § 87. But the section of the Constitution which grants this power specifically outlines the procedure to be employed by the court in carrying it into effect. It says that in all original proceedings "no jury trial shall be allowed in said supreme court, but in proper cases questions of fact may be sent by said court to a district court for trial." N. D. Const. § 87.

Before the North Dakota Constitution was adopted, perplexing questions had arisen in other states as regards the right of trial by jury of questions of fact in quo warranto proceedings brought directly in the Supreme Court. In Wisconsin and Kansas it had been found necessary to impanel a jury in the Supreme Court for the purpose of trying questions similar to those involved in this case. State ex rel. Atty. Gen. v. Messmore, 14 Wis. 116; State v. Allen, 5 Kan. 213; State ex rel. Johnston v. Foster, 32 Kan. 14, 3 P. 534. In a quo warranto proceeding brought in the Supreme Court of Michigan that court had referred the case to a circuit court for trial, the refusal of the lower court to try the case to a jury was held to be error and it was said that it was not within the power of the Supreme Court to deprive a

party of the right of trial by jury. People ex rel. White v. Doesburg, 16 Mich. 133. The provisions of the constitutions of Wisconsin, Michigan and Kansas, conferring original jurisdiction upon the Supreme Court were quite similar to those of the Constitution of North Dakota, but in none of those constitutions was there a provision similar to that in § 87 of the North Dakota constitution:—"No jury trial shall be allowed in said supreme court, but in proper cases questions of fact may be sent by said court to a district court for trial."

This is the first time in the history of this court that it has been confronted with the trial and determination of disputed questions of fact in a quo warranto proceeding instituted in this court. In all other quo warranto proceedings that have been instituted directly in this court no questions of fact were presented. And, so far as we can ascertain, during the entire history of the state there have been presented to this court for determination only two controversies involving title to an elective state office.

The first case involved the office of State Superintendent of Public Instruction and arose following the general election of 1918. At that election one Minnie J. Nielson received the highest number of votes for that office. A certificate of election was issued and she duly qualified. But the incumbent, N. C. Macdonald, refused to turn the office over to her. The Attorney General applied to this court for a writ of mandamus to compel the office to be surrendered to Miss Nielson. The incumbent, Macdonald, sought to assert, among other defenses, that Miss Nielson did not possess the prescribed legal qualifications and that, consequently, he was entitled to continue in office. This court held that the certificate of election issued to Miss Nielson was prima facie evidence of title to the office; that such prima facie title could not be defeated in a mandamus proceeding by averments of fact involving the ultimate title to the office and directed a writ of mandamus to be issued. Miss Nielson was accordingly placed in possession of the office. State ex rel. Langer v. Macdonald, 41 N. D. 389, 170 N. W. 873. After that decision had been rendered Macdonald, the incumbent, made application to the Supreme Court for leave to institute an original proceeding in quo warranto in the Supreme Court. The Attorney General appeared in opposition to the application, pointed out that the proceeding involved a trial and determination of issues of fact, and con-

tended that the relator should be required to institute action in the nature of quo warranto in the district court and try the issues there. This court denied the application for leave to institute an original proceeding in this court. The incumbent, Macdonald, thereupon brought action in the district court and the issues in the case were tried and determined there, and the controversy was brought to this court on appeal. Macdonald v. Nielson, 43 N. D. 346, 175 N. W. 361.

The second controversy arose in 1934 and involved the question whether the Governor of the state had been placed under disability as a result of a conviction for felony so as to cause the duties and powers of the Governor's office to devolve upon the Lieutenant Governor. That case presented no question of fact. It presented questions of law only. State ex rel. Olson v. Langer, ante, 68, 256 N. W. 377.

It seems entirely clear that the framers of the constitution did not intend that the Supreme Court ordinarily should hear witnesses, and weigh their testimony, and try and determine disputed questions of fact, especially where such questions were of such nature as to be properly triable to a jury; but it was intended that when an issue of fact properly triable to a jury arose in a proceeding in the supreme court such question should be sent to a district court for trial. In short, the procedure adopted in this case was in accord with the intent, spirit and purpose of the constitution. But, in view of the existing conditions (which according to the certificate of the trial judge arose after this court sent the case to the district court for trial), we are agreed that this court not only may but should try the case.

The jurisdiction conferred upon this court by § 87 of the constitution is a prerogative jurisdiction. "This jurisdiction is not only limited to prerogative writs but is confined to prerogative causes." Atty. Gen. v. Eau Claire, 37 Wis. 400, 443. The people of North Dakota in their constitution conferred this great judicial power upon the Supreme Court that it might be used in their behalf for the assertion of sovereign rights and to protect and vindicate the prerogatives and franchises of the state and the liberties of the people. This principle was announced in the early history of the state and has been steadfastly adhered to. State v. Nelson County, 1 N. D. 88, 45 N. W. 33, 8 L.R.A. 283, 26 Am. St. Rep. 609; State ex rel. Moore v. Archibald, 5 N. D.

359, 66 N. W. 234; State ex rel. Linde v. Taylor, 33 N. D. 76, 156 N. W. 561, L.R.A.1918B, 156, Ann. Cas. 1918A, 583.

"The jurisdiction," said Chief Justice Morgan (State ex rel. Steel v. Fabrick, 17 N. D. 532, 536, 117 N. W. 860), "is not to be exercised unless the interests of the state are directly affected. . . . The matters to be litigated must not only be publici juris, but the sovereignty of the state, or its franchises or prerogatives, or the liberties of its people, must be affected. . . . There must be presented matters of such strictly public concern as involve the sovereign rights of the state, or its franchises or privileges."

"This transcendent jurisdiction," said Chief Justice Winslow of Wisconsin (State ex rel. Bolens v. Frear, 148 Wis. 456, 134 N. W. 673, 135 N. W. 164, L.R.A.1915B, 569, Ann. Cas. 1913A, 1147), "is a jurisdiction reserved for the use of the state itself when it appears to be necessary to vindicate or protect its prerogatives or franchises, or the liberties of its people; the state uses it to punish or prevent wrongs to itself or to the whole people. . . ."

The governmental power thus reserved by the people for use by the state to protect, preserve and vindicate the sovereign rights of the state and of the people may not be thwarted or rendered impotent because circumstances render it difficult or even impossible to pursue the ordinary methods of procedure. And where, as here, it is shown that conditions exist which render the usual and ordinary methods of procedure inapplicable, inadequate or unavailing, other appropriate judicial means will be adopted so that the great ends for which the jurisdiction was reserved may not be defeated. Hence, inasmuch as in this case the usual and ordinary procedure was shown to be inadequate and ineffective, the court decided to try and determine all the issues in the case, both of law and of fact, directly in this court. Accordingly a trial was had at which evidence was adduced.

A written stipulation that Mr. Moodie is a citizen of the United States was filed leaving only the question of his constitutional qualification as to residence.

It is conceded that Thomas H. Moodie sold his newspaper at Mohall; that he left Mohall for Minneapolis, not intending to return to Mohall; that he arrived in Minneapolis in August, 1929; that he lived with his wife in Minneapolis until the 3rd day of April, 1931, at 2545

Blaisdell Avenue; that he registered as a voter and voted at the primary in June and at the general election in the fall; that his wife, with his knowledge, also, registered as a voter that year. But it is his contention that his residence in Minneapolis was temporary; that he went to Minneapolis because certain newspaper organizations in that city had information relating to papers in North Dakota which he, Moodie, might purchase and while waiting for an opportunity to purchase he had temporary employment on the Tribune.

Mr. Moodie is a newspaper man. He practically grew up in a newspaper office and apparently there was no kind of work about a newspaper office that he did not know and could not do. He could set type, run a linotype machine, write editorials, political or otherwise. He apparently was a very versatile and industrious man. He worked on newspapers in Minneapolis, St. Paul, Duluth, Virginia, Bemidji, New Orleans, St. Louis, Langdon, Grand Forks, Fargo, Wahpeton, Ray, Long Beach, San Francisco, Mohall, Williston, Minot, Bismarck and other cities. He apparently could drop into a city or town and go right to work in a newspaper office in some capacity. When he lived in a town or city long enough to entitle him to vote, he voted, and there never was any question about the legality of his vote or his right to cast the same.

The term "resided," as used in the Constitution, means having had a legal residence; that is, a residence entitling one to vote or to hold office in the State of North Dakota. Residence is defined in Section 14, Compiled Laws 1913, and the parts of § 14 which are applicable to the facts in the instant case are as follows: "Section 14. Every person has in law a residence. In determining the place of residence the following rules are to be observed:

"1. It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he returns in seasons of repose;

"2. There can be only one residence;

"3. A residence cannot be lost until another is gained; . . .

"7. The residence can be changed only by the union of act and intent."

In other words, every person has in law a residence where such person remains when not called elsewhere for labor or other special or

temporary purpose and to which he returns in seasons of repose; that he can have but one residence and the one residence to which he is entitled he cannot lose until another is gained; that is, leaving his place of residence is not an abandonment unless he establishes another, and a new residence can only be established by the union of act and intent; that is, there must be an actual change of residence, together with an intention to make such change.

The sole question of fact in the case is, did Thomas H. Moodie establish a legal residence in Minneapolis; that is, was there a union of act and intent to change the residence from Mohall, North Dakota, and establish it in Minneapolis, Minnesota? The act of moving to Minneapolis from Mohall without any intention of returning to Mohall and the living in Minneapolis with his wife at 2545 Blaisdell Avenue for a period of one year and nearly eight months are conceded, so that the question of fact is narrowed down to Mr. Moodie's intention.

Such questions have been many times in the courts and the law for determining the intention is well settled.

In the case of Nelson v. Gass, 27 N. D. 357, 146 N. W. 537, Ann. Cas. 1915C, 796, this court held: "The place of one's residence for the purpose of voting is where he has established his home, the place where he is habitually present, and to which, when he departs, he intends to return, and must be determined from all the facts and circumstances, and the intention must be accompanied by acts in harmony therewith." Syllabus, paragraph 9. In the opinion the court said: "A good-faith intent of a voter to make a place his home for all purposes is one essential element entering into the determination of the question of residence; and a domicil once gained does not continue until a new one is acquired, for voting purposes; nor does a right to vote at a particular poll or district continue until the right to vote elsewhere is shown, but the shortest absence coincident with an intention to change the residence defeats the right to vote at the former domicil. Kreitz v. Behrensmeyer, 125 Ill. 141, 17 N. E. 232, 8 Am. St. Rep. 349; . . . Berry v. Wilcox, 44 Neb. 82, 62 N. W. 249 and note in 48 Am. St. Rep. 712. The question of residence must be determined from all the facts and circumstances surrounding the person, as related to his residence, and the intention must be accompanied by acts in harmony with the declared intention; and notwithstanding one may

testify that his intention was to make his home in a certain place, if his acts are of a character to negative his declaration or inconsistent with it, it is clear that the court cannot be governed by his testimony as to intention.

"In harmony with our views we quote briefly from State v. Savre, 129 Iowa, 122, 105 N. W. 387, 3 L.R.A.(N.S.) 455, 113 Am. St. Rep. 452: 'A person cannot live in one place, and by force of imagination constitute some other his place of abode. The intent and the fact, as already stated, must concur.' . . . See also, People v. Moir, 207 Ill. 180, 69 N. E. 905, 99 Am. St. Rep. 205; Gardner v. Board of Education, 5 Dak. 259, 38 N. W. 433; People v. Ellenbogan, 114 App. Div. 182, 99 N. Y. S. 897; Frost v. Brisbin, 19 Wend. 11, 32 Am. Dec. 423; White v. Slama, 89 Neb. 65, 130 N. W. 978, Ann. Cas. 1912C, 518. In Widmayer v. Davis, 231 Ill. 42, 83 N. E. 88, it was held that a man who lived for a year or more in a ward, but prior to an election moved away, and left clothing and kept the key of the house in which he had lived so he might be entitled to vote, was not a qualified voter."

In Shelton v. Tiffin, 6 How. 185, 12 L. ed. 397, the court said: "On the change of domicile from one State to another, a citizenship may depend upon the intention of the individual. But this intention may be shown more satisfactorily by acts than declarations."

In Re Venus, 8 Cranch, 279, 3 L. ed. 562, it is said: "If one removes with intent to make a permanent settlement or for an indefinite time, he changes his domicile."

In the case of State v. Stoelting, 53 N. D. 736, 208 N. W. 101, this court said: "While registering and voting in a particular place is not conclusive, it is strong circumstantial proof of residence." This statement of the law is supported by the great weight of authority. The fact of voting is not conclusive, but it is a strong circumstance which indicates the intention of the voter to cast a legal vote.

The case of Kadlec v. Pavik, 9 N. D. 278, 83 N. W. 5, was an election contest. It was claimed that one Jarus was foreign born; that he came to this country about ten years before the election was held and when he was about twenty years old. There was no evidence to show that he had ever denationalized himself. He lived in Walsh county for seven or eight years before this election was held. The

contestant showed these facts and then showed that the records of Walsh county failed to show that he had ever declared his intention to become a citizen of this country or received his final naturalization papers. From these facts the trial court concluded that a legal presumption arose that Jarus was not a legal voter and this court said: "It is a case that rests largely upon presumptions. The alienage being shown, it is presumed to continue until evidence to the contrary is shown. Hauenstein v. Lyhnam, 100 U. S. 483, 25 L. ed. 628. But, when it is shown that the party has cast a vote in this country, then this presumption disappears, and the opposite presumption prevails, because the law will not presume that a party has committed any unlawful act. Gumm v. Hubbard, 97 Mo. 311, 11 S. W. 61, 10 Am. St. Rep. 312."

In that case it was shown that Jarus was foreign born and the presumption of law that this condition continued until the contrary was shown was overcome by the presumption of law that the vote cast was a legal vote. The same presumption applies to the vote cast by Mr. Moodie at the primary election and the general election which followed in Minneapolis; that is, the presumption is that his voting in Minneapolis was legal. An examination of the authorities will show that the law, as stated by Judge Spalding (Nelson v. Gass, 27 N. D. 357, 146 N. W. 537, Ann. Cas. 1915C, 796, supra) for determining residence is supported by the great weight of authority and it is entirely unnecessary to cite the authorities at length. But see Pacific Mut. Ins. Co. v. Tompkins (C. C. A. 4th) 101 F. 539; Tuttle v. Wood, 115 Iowa, 507, 88 N. W. 1056; Hairston v. Hairston, 27 Miss. 704, 61 Am. Dec. 531; Pope v. Williams, 98 Md. 59, 56 A. 543, 66 L.R.A. 398, 103 Am. St. Rep. 379; Gaddie v. Mann (C. C.) 147 F. 955; Chambers v. Prince (C. C. A. 9th) 75 F. 177; Jones v. Subera (C. C.) 150 F. 462; Corel v. Chicago, R. I. & P. R. Co: (C. C.) 123 F. 452; Blair v. Silver Peak Mines (C. C.) 93 F. 332; Mitchell v. United States, 21 Wall. 350, 22 L. ed. 584.

"By the use of the word 'intention' in the statute it is reasonably clear the legislature did not mean an undefined or undefinable purpose on the part of the voter to return to his former residence at some unknown time during the course of his life. To entertain a doubtful, vague, or equivocal purpose to return does not prove the fact of 'inten-

tion' as used in the statute, when reasonably construed in view of the legislative object and the general law on the subject of domicile. That a person may live in one voting district and do business there and at the same time retain a right to vote in another district is undoubtedly true; but the right depends upon a reasonable intention to resume his former home and to rebut the presumption that he had abandoned it." Kennan, Residence & Domicile, § 500, quoting from Felker v. Henderson, 78 N. H. 509, 102 A. 623, L.R.A.1918E, 510.

"The difficulties which are met with in connection with this question are due not so much to any obscurity or uncertainty in the law as to the infinite variety of facts and circumstances which have to be considered in its application to individual cases. In every case of change of domicile there are three essential elements which must concur, viz.:

"First. A definite abandonment of the former domicile.

"Second. Actual removal to, and physical presence in the new domicile.

"Third. A bona fide intention to change and to remain in the new domicile permanently or for an indefinite time.

"Nothing is better settled in the law of domicile than that every change must be facto et animo—in fact and intent. It is also elementary that every man must have a domicile somewhere, that the presumption is against a change of domicile and that the burden of proof rests upon the one alleging a change of domicile." Kennan, Residence & Domicile, § 92; Putnam v. Johnson, 10 Mass. 488; Wharton, Confl. of Laws, § 58; Sleeper v. Paige, 15 Gray, 349.

"A person's residence is the place of his domicile, or place where his habitation is fixed without any present intention of removing therefrom. The words 'inhabitant,' 'citizen,' and 'resident,' as employed in different constitutions to define the qualifications of electors mean substantially the same thing; and one is an inhabitant, resident or citizen at the place where he has his domicile or home. Every person at all times must be considered as having a domicile somewhere, and that which he has acquired at one place is considered as continuing until another is acquired at a different place." Cooley, Const. Lim. p. 1365; People v. Turpin, 49 Colo. 234, 112 P. 539, 33 L.R.A.(N.S.) 766, Ann. Cas. 1912C, 724; Welsh v. Shumway, 232 Ill. 54, 83 N. E. 549; Elam v. Maggard, 165 Ky. 733, 178 S. W. 1065; Carwile v. Jones, 38

356

Mont. 590, 101 P. 153; Re Rooney, 172 App. Div. 274, 159 N. Y. S. 132; Finn v. Board of Canvassers, 24 R. I. 482, 53 A. 633; Clarke v. McCowan, 107 S. C. 209, 92 S. E. 479; Seibold v. Wahl, 164 Wis. 82, 159 N. W. 546, Ann. Cas. 1917C, 400.

In the case of Re Rooney, 172 App. Div. 274, 159 N. Y. S. 132, the court said: "There is no suggestion that any one of these men intended to commit a crime; they have acted in entire good faith, believing that they had a right to determine for themselves their voting residences, as distinguished from their homes, based upon some popular impressions which have found their justification in the determination of the court in People v. Platt, 117 N. Y. 159, 22 N. E. 937. . . .

"It is true, of course, that a person may have two or more residences, as distinguished from a domicile (Bischoff v. Bischoff, 88 App. Div. 126, 85 N. Y. S. 81, and authorities there cited); but the word 'residence' or 'resident,' when used in the Constitution, or in the statutes relating to the subject of voting and eligibility to office, jurisdiction in divorce, probate, and administration, etc., is in nearly every case synonymous with 'domicile.' Cincinnati, H. & D. R. Co. v. Ives, 21 N. Y. S. R. 67, 3 N. Y. S. 895, and authorities there cited; Bell v. Pierce, 51 N. Y. 12, 17; Barney v. Oelrichs, 138 U. S. 529, 532, 34 L. ed. 1037, 1038, 11 S. Ct. 414; De Meli v. De Meli, 120 N. Y. 485, 491, 24 N. E. 996, 17 Am. St. Rep. 652."

Now, what are the facts to which this law must be applied. Thomas H. Moodie was practically all his life engaged in the newspaper business. He was a legal resident of Mohall, North Dakota, in July, 1929, when he sold his newspaper and wrote and published a beautiful farewell message to its patrons and the citizens generally of Mohall, expressing many fine and beautiful sentiments of good will and concluding with a statement that his future was indefinite. He stored part of his furniture in Mohall and part of it at Minot, North Dakota, went with his wife to Minneapolis and took up a residence in an apartment at 2545 Blaisdell Avenue, where he remained for a period of one year and nearly eight months. During that time and after he had been at this place for a period which lawfully entitled him to vote, he registered as a voter as required by the laws of the State of Minnesota, voting at the primary and at the general election in the fall for state and county officers in the State of Minnesota.

He filed a Federal income tax return, giving his residence as 2545 Blaisdell Avenue, Minneapolis. The laws of Minnesota require a license to fish, and provide for a resident license and a non-resident license. Mr. Moodie took out a resident license and gave his address as 2545 Blaisdell Avenue, Minneapolis, Minnesota. When he returned to North Dakota in 1931 and became a resident of Williston in answer to the question in his state income tax return, viz.: "Did you file an income tax return last year?" he answered "No, not a resident then." He also made three applications for automobile licenses in Minnesota while there, giving his place of residence 2545 Blaisdell Avenue, Minneapolis. The automobile applications we do not consider very important, as non-residents, after a certain limited time, are required to take out an automobile license. However, they are admissible for what they are worth as evidence of intention. As against these physical facts are the statements of the witnesses to whom he talked when he went to Minneapolis and to whom he said that he intended to purchase a paper in North Dakota and return to that state. We think from the whole record that Mr. Moodie did intend to return to the state of North Dakota sometime. His testimony, his statements to the witnesses in Minneapolis and the fact that he did return all indicate an intention to return sometime. On the witness stand his truthfulness was apparent to everyone. He answered all questions without hesitation when the answers were unfavorable as well as when they were favorable. He stated that his plans were indefinite when he left Mohall; that within a week from the time he sold his paper at Mohall he began negotiations for "The Williston Herald;" that he left Mohall not intending to return to Mohall; that his employment with the Tribune was temporary; that he wanted to get into business for himself, preferably in North Dakota; but that he would purchase a country paper elsewhere than in North Dakota, if he got a good buy. His truthfulness and candor on the stand were recognized and acknowledged by the attorney general in his argument. It is true, that Mr. Moodie stated that he was asked to vote in Minneapolis and he thought he had a right to vote as he had lived there for the lawful time and that his voting there would not affect his residence in North Dakota. But his registering and voting in Minneapolis were in harmony with his custom of voting wherever he was on election day if he had been in the

state and election precinct long enough to cast a legal vote. It is quite apparent from this record, that while Mr. Moodie had an intention to return sometime to North Dakota, he had the intent when he registered as a voter in Minneapolis, to cast his vote as he had always cast it and that he did not intend to exercise any rights of citizenship in North Dakota while he was in Minnesota but intended to exercise them in Minnesota. He knew that North Dakota had an absent voter's ballot law; but he did not attempt to vote by absent ballot and did not in any way claim any benefit or any privilege of citizenship in North Dakota.

As stated in the case of Dickinson v. Brookline, 181 Mass. at page 196, 63 N. E. 331, 92 Am. St. Rep. 407, "When you intend the facts to which the law attaches a consequence, you must abide the consequence whether you intend it or not."

Mr. Moodie intended to cast a legal vote in Minnesota and he was qualified under the laws of Minnesota to vote at the election at which he voted. His manner of voting in Minneapolis was no different from his manner of voting in Grand Forks, Wahpeton, Mohall and Williston. He took an interest in public affairs, as every good citizen should, and always voted when and wherever he could cast a legal vote. No one ever questioned the legality of any vote he ever cast in North Dakota, Minnesota or elsewhere. They were all legal votes. He did not register in Minnesota as a voter until after he had been living at 2545 Blaisdell Avenue for the length of time required by law to entitle him to vote.

His residence at 2545 Blaisdell Avenue, Minneapolis, Minnesota, was intended as a legal residence for the purpose of voting and enjoying all the civil rights and privileges granted by the Constitution and the laws of Minnesota and to secure such rights he strictly complied with all the requirements of the law. There is nothing in this record which reflects in any way upon Mr. Moodie. He violated no law and did no wrong; but his removing to Minneapolis and establishing a voting residence there deprived him of his legal residence in North Dakota during the time he was in Minneapolis and it necessarily follows that he was not a resident of North Dakota for the five years next preceding the election in November, 1934, as required by § 73 of the Constitution.

This proceeding was instituted by the Attorney General. The State itself is plaintiff. Its purpose is not merely to try the title of Mr.

Moodie to the office of Governor but also to determine the question of succession in case Mr. Moodie is held ineligible. Accordingly the Attorney General joined Mr. Welford as a party respondent and set forth in the information that "in the event that the said respondent Thomas H. Moodie be held to be disqualified and ineligible to hold such office for the term commencing on the first Monday in January, 1935, the powers and duties thereof will devolve upon the respondent Walter Welford and it will thereby and then become his duty to exercise the powers and duties of the office of Governor of North Dakota. . . ." And the Attorney General's information concluded with the prayer "that the court declare, state and fix the rights, status, and legal relations of the said respondent Walter Welford to the office of Governor and for such other and further relief as the court may deem just and proper in the premises."

It therefore becomes necessary to consider the status of Walter Welford and his legal relation to the office of Governor. The Constitution of the state says,

Sec. 1. "The executive power shall be vested in a governor, who shall reside at the seat of government and shall hold his office for the term of two years and until his successor is elected and duly qualified."

Sec. 72. "A lieutenant governor shall be elected at the same time and for the same term as the governor. In case of the death, impeachment, resignation, failure to qualify, absence from the state, removal from office, or the disability of the governor, the powers and duties of the office for the residue of the term, or until he shall be acquitted or the disability be removed, shall devolve upon the lieutenant governor."

Under § 71 the governor holds office until "his successor is elected and duly qualified." Under § 72 in event of the "failure to qualify" on the part of the governor, the powers and duties of the office devolve upon the lieutenant governor. Since Thomas H. Moodie did not possess the qualifications required of a governor at the time of the general election, he was under legal disability. It is undisputed that Walter Welford was legally elected and has qualified as lieutenant governor. Under § 678, Compiled Laws 1913, all state officers are required to qualify on or before the first Monday of January next succeeding their election, or within ten days thereafter. When the time arrived for the

state officers elected at the general election of 1934 to qualify, Ole H. Olson was the acting governor. The governor had been disqualified (State ex rel. Olson v. Langer, ante, 68, 256 N. W. 377) and the disability resulting in such disqualification still exists.

The word successor as used in Section 71 means someone who is entrusted with the powers and is obligated to perform the duties of his predecessor. The lieutenant governor is not appointed to fill a vacancy. No act is required on the part of any official or governmental body to confer upon him the powers and duties of governor in event of the "impeachment, resignation, failure to qualify, absence from the state, removal from office, or the disability of the governor." His authority is derived directly from the constitution. From the above quoted language, it will be noted that a number of specific instances are set out followed by the general term "or the disability of the governor." In State ex rel. Olson v. Langer, ante, 68, 256 N. W. 377, this Court, in discussing the meaning of this last phrase, said,

"The word 'disability' has a reasonably definite meaning. It means: 'State of being disabled; deprivation or want of ability; absence of competent physical, intellectual, or moral power, means, fitness, or the like; an instance of such want or deprivation.' It connotes 'want of legal qualification to do a thing; legal incapacity, incompetency, or disqualification; also, an instance or cause of such incapacity.' Webster's New International Dictionary. We must presume, of course, that the words used by the framers of the Constitution were used in their ordinarily accepted sense, unless the contrary clearly appears. Indeed, unless given the ordinary and accepted meaning, disability would have no place in this constitutional provision."

The lack of residential qualifications on the part of the governor is a legal disability. The constitution does not differentiate between a disability existing before election and one occurring after election in regard to the right of the lieutenant governor to assume the powers and duties of the office of governor. The provision in the constitution devolving these powers and duties upon him must be construed in the light of reason. The context must be considered. When the framers of the constitution used the language which we are here considering, they intended to include legal as well as physical or mental disabilities, and did not exclude disabilities existing prior to election.

Even though the general election of 1934 was a legal nullity insofar as the election of a governor is concerned, we must bear in mind that there was a legal and valid election of a lieutenant governor. There was an expression of the electors as to both offices. Careful reasoning leads us to the conclusion that the framers of our Constitution intended by § 72 to designate a person who would act as governor in event that the person elected as governor should fail or cease for any reason to act. The general function of the lieutenant governor is to act in event the governor cannot or does not exercise the powers and perform the duties of his office. He must possess the same qualifications as the governor. These qualifications are not affected by the particular type or nature of the disability which prevents the governor from acting. The constitution does not say that the lieutenant governor shall act if the governor is under certain disabilities and shall not act if he labors under others. The governor-elect could not legally qualify as governor for the term to which he was elected because of his failure to possess the required qualifications. The lieutenant governor, elected at the same election does possess the required qualifications. He has been chosen by the people to act as governor in event the governor fails to qualify, or is unable to act because of disability. Section 2 of the Constitution states, "government is instituted for the protection, security and benefit of the people." Clearly the interests of those who hold office or seek authority are of minor importance when considered in the light of the declared purpose of the Constitution.

The purpose of a hold-over provision is to conserve the public interests by preventing a vacancy in office. Such provision is not designed or intended to extend the tenure of office by an incumbent for his own benefit beyond the specified term. 23 Am. & Eng. Enc. Law, 2d ed. p. 147. It is the policy of the law of this state that every two years the people shall choose not only the governor but the officer or officers who shall succeed the governor and perform the duties of his office in case he for any reason is unable to qualify, or dies or becomes disqualified to serve during the term of office. A hold-over provision applies only when there is no qualified successor; but in this case there is a qualified successor. The framers of the constitution, having in mind the great importance of the office of governor, provided not merely for one successor; but they provided for another successor (N. D. Const. § 72)

in case the first should, for any reason, be unable to serve, and for still another in case the second should also be unable to serve. N. D. Const. § 77.

If the governor-elect fails to qualify or is disqualified, the lieutenant governor is the successor in office to the former governor or acting governor. The election and qualification, of a governor or of a lieutenant governor in event the governor-elect is disqualified, meets the requirement of § 71 that the governor serves until his successor is elected and duly qualified. In event of the disqualification of the governor-elect, the legal election and qualification of the lieutenant governor supplies a successor and terminates the former administration. The purpose of the provision in § 71 of the Constitution to the effect that the governor "shall hold his office until his successor is elected and duly qualified" is to prevent a hiatus in government, to guard against any lapse or period when there would be no officer to discharge the duties of governor. It is a provision made for the benefit of the public. It is a lengthening out of the service of the incumbent to the commencement of the term of a new incumbent authorized to exercise the powers and perform the duties of governor, whether that new incumbent be a newly elected governor or other officer. authorized to exercise the functions of the office. When such new incumbent qualifies and takes possession of the office the old administration is at an end. It cannot be revived. The functions of governor devolve upon the officials elected at the last general election in the order of succession provided for in the constitution. Walter Welford will serve as acting governor for the residue of the term for which Thomas H. Moodie was elected. It is the duty of Mr. Moodie to surrender the office of governor to Lieutenant Governor Welford. Though Mr. Moodie is not entitled to hold the office, nevertheless no question can be raised as to the validity of the official acts performed by him. Under the wise provisions of the law every act so done is valid and effective. He was clothed with prima facie title to the office. State ex rel. Sathre v. Byrne, ante, 283, 258 N. W. 121; State ex rel. Butler v. Callahan, 4 N. D. 481, 61 N. W. 1025. He was a de facto officer. As such he was clothed with all the rights and powers that he would have enjoyed as a de jure officer possessed of every qualification. State ex rel. Brockmeier v. Ely, 16 N. D. 569, 113 N. W. 711, 14 L.R.A.(N.S.) 638.

The application for the writ must be granted. It is assumed the respondents will act in conformity with this decision without the issuance of a formal writ.

BURR, NUESSLE, MORRIS and CHRISTIANSON, JJ., concur.