Gust MITTELSTADT et al., Plaintiffs and Appellants,

and

Thorvald Bang, Plaintiff,

v.

Jerry BENDER et al., Defendants and Appellees.

Civ. No. 8880.

Supreme Court of North Dakota.

Aug. 10, 1973.

Freed, Dynes & Malloy, Dickinson, for plaintiffs and appellants.

Marshall T. Bergerud, Killdeer, and Rausch & Chapman, Bismarck, for defendants and appellees.

ERICKSTAD, Chief Justice.

This action was brought by the plaintiffs, residents and taxpayers of Killdeer Public School District No. 16, to challenge a bond-issue election held within that district on July 13, 1972. The defendants are the members of the Board of Education of Killdeer Public School District No. 16 and Killdeer Public School District No. 16, Dunn County, North Dakota. We shall hereinafter refer to the plaintiffs as the Contestants and the defendants as the Board of Education.

The election was held pursuant to Subsection 6 of Section 21–03–07, N.D.C. C., which authorizes the issuance of municipal bonds by the school board of any school district upon the approval of sixty percent of the electors voting upon the question of such issue.

The results of the election as determined by the school board are as follows:

| Valid ballots | 807 |
| Ballots favoring the bond issue | 486 |
| Ballots opposing the bond issue | 321 |

Based upon these figures the issue was declared passed by a 60.22% majority.

The trial court disallowed three affirmative votes but this did not change the outcome of the election, the affirmative votes constituting 60.07% of the total after recalculating the results.

On this appeal the Contestants' principal contention is that the trial court erred in not disallowing ten absent voters' ballots, two cast by Mr. and Mrs. Gerald Ehli, who were alleged to have lost their residency by the time they cast their votes by moving from Killdeer to Grand Forks, and eight cast by residents on the calendar day of election, alleged to be in violation of Section 16–18–05, N.D.C.C.

On the question of the Ehlis' residency the trial court found:

"That Gerald Ehli and Sharon Ehli, his wife, did vote by absent voters' ballot in said July 13, 1972, election; that the Ehlis established their residence in Killdeer in 1969 at the time of his employment as a teacher by the Killdeer Public School District No. 16 which residence was continually maintained; Mr. Ehli did not renew his teaching contract for the 1972–73 school term but decided to temporarily discontinue his teaching career for a period of one year in order to secure his Master's Degree at the University of North Dakota Graduate School in Grand Forks, North Dakota, and in furtherance thereof the Ehlis did leave Killdeer May 30, 1972, and did arrive in Grand Forks on May 31, 1972; that on June 29, 1972, Gerald Ehli and Sharon Ehli made application to the Clerk of Killdeer Public School District No. 16 for absent voters' ballots for the July 13, 1972, election; that the ballots were sent by mail to them by the said

clerk and which ballots were on or about July 7, 1972, returned by the Ehlis to the clerk; that the move to Grand Forks by the Ehlis was but a temporary and transitory move for the purpose of completing the education of Mr. Ehli and that there was no intent on the part of either of said persons to change their residence from Killdeer, North Dakota, and that on said date Gerald Ehli and Sharon Ehli were duly qualified electors of Killdeer Public School District No. 16."

■ The scope of review of the findings of the trial court on appeal to this court from a case tried without a jury is governed by Rule 52(a) of the North Dakota Rules of Civil Procedure, which reads in part:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

■ Sharon and Gerald Ehli did not testify in person at the trial, but their testimony was received by deposition. We have reviewed this evidence and conclude that the trial court's finding relative thereto is not "clearly erroneous". The facts appear to be that the Ehlis left Killdeer at the end of the school term, on May 30, 1972, after having resided in Killdeer for three years, and after having voted at school elections therein while Gerald was a teacher in the Killdeer Public School; they arrived in Grand Forks on May 31, 1972, where Gerald enrolled in graduate school at the University of North Dakota, and where Sharon became employed by the State Highway Department; they applied for absent voters' ballots on June 29, 1972, and cast those ballots on July 7, 1972; they did not vote or attempt to vote otherwise after leaving Killdeer.

Pertinent are Subsections 3 and 7 of Section 54–01–26, N.D.C.C.

"3. A residence cannot be lost until another is gained."

"7. The residence can be changed only by the union of act and intent."

In essence, the trial court found that there was not sufficient proof of union of act and intent to deprive them of the privilege of voting in Killdeer. Had the Ehlis voted in some other election, they would have disclosed an intent to establish a new residence. They had not otherwise voted as of the date of the deposition on September 12, 1972, which is a date subsequent to the primary election.

The burden of proof in this case is on the parties who are attempting to disfranchise the Ehlis. The trial court found that the contesting parties had not sustained that burden. We agree.

Pertinent, we believe, is what this court said in 1935.

" * * * every person has in law a residence where such person remains when not called elsewhere for labor or other special or temporary purpose and to which he returns in seasons of repose; that he can have but one residence, and *the one residence to which he is entitled he cannot lose until another is gained;* that is, leaving his place of residence is not an abandonment unless he establishes another, and *a new residence can only be established by the union of act and intent;* that is, there must be an actual change of residence, together with an intention to make such change." State ex rel. Sathre v. Moodie, 65 N.D. 340, 258 N.W. 558, 563 (1935). [Emphasis added.]

The eight other absent voters' ballots in question were applied for, voted, and delivered, all at the home of the clerk of the school district prior to 11 a. m., the time at which the polls opened on election day.

Relative thereto the trial court said:

"That Chapter 16–18 of the North Dakota Century Code establishing the right to vote by absent voters' ballot should be liberally construed to the effect the purpose thereof; that the purpose thereof is to extend the right to vote to qualified electors who will not have an opportunity to vote in person; that all provisions of election laws such as these are mandatory, if enforcement is sought before election in a direct proceeding for that purpose, but after election they shall be held to be directory only. That the election of July 13, 1972, was fairly held pursuant to statutory requirements, was free from fraud and was a fair and free expression of the will of the legal voters upon the merits.

* * * * * *

"That the eight (8) persons voting by absent voters' ballots on the election day, and each and every one of them, was a qualified elector of said Killdeer Public School District No. 16 on July 13, 1972, and did meet the requirements of Chapter 16–18 of the North Dakota Century Code establishing qualifications for absent voters' ballots and that each of said votes cast by the said eight persons was a valid vote."

The pertinent section of our Code reads:

"16–18–05. Time for making application for ballot.—*At any time within thirty days next preceding an election* any voter expecting to be absent on the day of election from the county in which his voting precinct is situated, or who by reason of physical disability, or who is serving in the military or naval service or the merchant marine of the United States of America and is unable to attend at the polling place in his precinct to vote at such election, may make application to the county auditor of the county, the auditor or clerk of the city or the clerk of the school district, as the case may be, for an official ballot to be voted at such election. *No such auditor or clerk shall issue ballots for absentee voters on the day of the election."* N.D.C.C. [Emphasis added.]

The Contestants contend that these eight ballots should be disallowed because this

statute not only prohibits the delivery of absent voters' ballots on the day of the election but also requires that the voter make application for such ballot within thirty days next preceding the election.

 Applying the rule that statutes should be liberally construed to effect their objects and promote justice (Section 1–02–01, N.D.C.C.); believing that the object of Chapter 16–18, N.D.C.C., is to extend the vote to qualified electors rather than to restrict that right; finding that the election was free from fraud and represented a free expression of the will of the voters, the trial court permitted the eight ballots to be counted, notwithstanding that it found them to be cast in violation of Section 16–18–05, N.D.C.C.

 In finding the ballots cast in violation of Section 16–18–05, N.D.C.C., the trial court determined that an election day is the same as a calendar day.

With the analysis of Section 16–18–05, N.D.C.C., and with the conclusion that the ballots should nevertheless be counted in this case, we agree.

In Great Northern Railway Company v. Esterby, 179 N.W.2d 725 (1970), this court said:

"2. As a general rule, provisions of election laws are mandatory, if enforcement is sought before election in a direct proceeding for that purpose; but after election, all should be held directory only, in support of the results, unless of a character to effect an obstruction to the free and intelligent casting of the vote or to the ascertainment of the results, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.

"3. Because of the importance of elections to the preservation of a democracy, statutes tending to limit the citizen in the exercise of his right of suffrage should be construed liberally in his favor." Syllabus ¶¶ 2 and 3.

The principal case referred to by the Contestants is State v. Lyon, 119 Mont. 212, 173 P.2d 891 (1946). Its pertinent language reads:

"Absentee voting is therefore an exception to the customary and usual manner of voting. It is a privilege granted by the lawmakers which enables the absentee elector, the physically incapacitated elector, and the elector who has reason to believe that before election day he will be absent from his county or physically incapacitated to obtain and mark his ballot in a different manner and at a different time and place than is required of electors generally who present themselves in person at their respective precinct polling places on the day of election.

"For these reasons the laws conferring and regulating the privilege of absentee voting have generally received a strict construction. 29 C.J.S., Elections, § 210, p. 297. The absent voters law is in derogation of the common law and of the general election law. It merely confers a privilege and not an absolute right. [Citations omitted.]

"It is optional with the elector whether or not he shall take advantage of the opportunity afforded him by the absent voters law. If an elector desires to exercise the privilege of absentee voting he must comply with the provisions of the law which accords him that privilege. The absent voters law provides the exact manner of exercising the privilege. Those provisions and regulations constitute conditions precedent with which the elector must comply to enable him to enjoy the privilege." State v. Lyon, 119 Mont. 212, 173 P.2d 891, 893 (1946).

As indicated by *Esterby*, our State has taken a more liberal view than that expressed by Montana.

Another North Dakota decision disclosing a reluctance to upset elections is that of Kerlin v. Devils Lake, 25 N.D. 207, 141 N.W. 756, 758 (1913). In *Kerlin,* the court said:

"And, where the court must choose between holding valid or invalidating an entire election, the reason for holding the election valid would be stronger where, as in a case of this kind, an entire city must be disfranchised than where the ballots of a limited number of persons, or even a precinct, would be thrown out. If courts hesitate to disfranchise the few, the greater the reason then for reluctance in setting aside the expressed will of all by the declaration that a whole election is invalid. Hence we find the rule of law, announced for the application of statutes and the particular constitutional provision before us, in cases similar to this, to be that *generally where the statute does not in express terms declare that the election shall be void,* or where the constitutional provision does not by reasonable inference invalidate the election, *the election will be sustained, and the violation of statute will be treated as an irregularity going to the form instead of to the substance, where from all the facts the court does conclude that, in spite of the departure from statutory requirements, a full and fair ballot has been cast and a true and fair return of the entire election has been canvassed and made.* Indeed, it has been held that this rule of law is so well established that it should be considered as the common law, controlling in the light of which the statute was enacted and with which the statute must be interpreted and effecting its application, unless the statute in express terms negatives it by a declaration that the election held in disregard of the statute shall be void." [Emphasis added.]

See also Nordby v. Dolan, 78 N.W.2d 689 (N.D.1956), and Kiner v. Well, 71 N.W.2d 743 (N.D.1955).

As our statutes are to be liberally construed to effect their objects and promote justice; as the object of Chapter 16–18, N.D.C.C., is to extend the vote to qualified electors rather than to restrict that right; as the election was free from fraud and represented a free expression of the will of the voters; as Section 16–18–05, N.D.C.C., prohibiting the issuance of absent voters' ballots on election day, does not specifically declare that compliance therewith is essential to the validity of an election, we conclude that the eight challenged absent voters' ballots were properly counted in the election, notwithstanding that they were issued and voted on the day of the election.

The Contestants further contend that the failure to provide voting booths or enclosures of any kind at the polling place invalidates the election. The pertinent statute reads:

"Election booths or compartments—Number required—Expense.—The inspector of elections shall provide a sufficient number of booths or compartments in his polling place which shall be furnished with such supplies as to enable the elector to mark his ballot screened from observation. The number of booths or compartments in precincts in which voting machines are not used shall not be less than one for each fifty electors or fraction thereof in the precinct. The expense of providing such booths or compartments shall be a public charge and shall be provided for in the same manner as other election expenses." Section 16–12–10, N.D.C.C.

The trial court found that the facilities provided ample space and accommodations to enable the voters to cast a secret ballot. In that finding we agree. The room in which the voting took place was approximately 25 feet by 65 feet. It contained a clerk's table and a judge's table for the officials. For voting purposes it contained three large banquet tables and a

large desk near the front of the room and one additional table in the rear of the room. The windows were located in the front of the building away from the voting area.

Applying the same principles of law to this issue as to the previous issues, we conclude that the trial court properly held that the failure to comply with this statute should not invalidate the election, no abuse having resulted from a failure to provide the voting booths.

By so holding, we do not mean to minimize the importance of voting booths. We do believe, however, that the failure to provide the voting booths in the election does not constitute sufficient cause to set aside this election.

The last contention we must consider is that because two residents (a man who was hospitalized in Dickinson and his wife, who was staying with him) were denied the privilege of casting their votes by absent voters' ballots after 11 a. m. on election day when their votes would have been negative votes, the election must be set aside or their votes must be counted in opposition to the bond issue.

The argument seems to be that since eight absent voters' ballots which were cast on election day prior to the opening of the polls at 11 a. m. were counted, two absent voters' ballots not cast but for which application was made through a son orally to the officials at the polls on election day at about 11 a. m., and which ballots would have been negative, must be counted to defeat the election. We do not agree.

If we were to so rule in the absence of fraud, we would be encouraging contests in all close elections, with the attendant confusion and disruption of government.

Since the election officials were uniformly applying a rule, erroneous in retrospect, that election day commenced with the opening of the polls, their action in denying absent voters' ballots to parties who were unable to cast their ballots before the opening of the polls on election day does not justify either a setting aside of the election or the counting of the two ballots not actually cast as negative votes in the bond issue, no fraud having been involved.

For the reasons stated, the judgment of the trial court is affirmed.

VOGEL, TEIGEN, PAULSON and KNUDSON, JJ., concur.