STATE of Missouri ex rel. R. J. KING, Jr.,
Individually and as a Member of the Class
of Registered and Qualified Voters and
Electors of the State of Missouri, Relator,

v.

Eugene WALSH et al., Respondents,

Christopher S. (Kit) Bond,
Intervenor-Respondent.

No. 58037.

Supreme Court of Missouri,
En Banc.

Aug. 5, 1972.

Dissenting Opinions July 28 and
Aug. 5, 1972.

Thomas M Gioia, Crestwood and Anthony M. Gioia, St. Louis, by Thomas M. Gioia, Crestwood, and Albrecht & Homire, by James L. Homire, Jr., St. Louis, for relator.

Lewis, Rice, Tucker, Allen & Chubb, by F. Wm. McCalpin, Robert S. Allen, Kathianne Knaup, St. Louis, Joseph E. Stevens, Jr., Kansas City, for intervenor-respondent Christopher S. (Kit) Bond.

HENLEY, Judge.

This is an original proceeding in prohibition filed July 19, 1972, by which relator, individually and as representative of a class, seeks to prohibit respondents, as members of the Board of Election Commissioners of St. Louis county and as representatives of a class, from placing the name of Christopher S. (Kit) Bond upon the ballot as a candidate at the primary election to be held August 8, 1972, for nomination as the Republican candidate for Governor of this state. Our provisional rule was issued July 20, returnable July 24, 1972. In this interim, Mr. Bond was, on his motion, granted leave to and did intervene as a respondent. On July 24, 1972, respondents and the intervenor-respondent (hereinafter intervenor) filed their separate returns and the case was set for hearing and was heard on July 26 and 27. Thereafter, shortly after submission on July 27, 1972, the court entered its judgment discharging the provisional rule. We now state our reasons therefor.

The ground on which relator sought to so prohibit respondents was that intervenor was not qualified to be a candidate for nomination as the Republican candidate for Governor, because he would not on the date of the general election, November 7, 1972, meet the following qualification for that office required by Article IV, § 3, Constitution of Missouri: "The governor * * * shall have been * * * a resident of this state at least ten years next before election." Relator asserts in support of this conclusion that intervenor physically resided outside the state of Missouri and in other states as follows: (1) at Charlottesville, Virginia, while attending the law school of the University of Virginia from 1960 through 1963; (2) during the summer of 1961 in New York City while employed by the New York County District Attorney's office; (3) during the summer of 1962 in Atlanta, Georgia, while employed by an Atlanta law firm; (4) in Atlanta, Georgia, from July 1963 through June 1964, while employed as a law clerk by the Chief Judge of the United States Court of Appeals for the Fifth Circuit; (5) in Washington, D. C., from the fall of 1964 through the fall of 1967, while employed by a Washington law firm. Relator also asserts that intervenor made certain statements and performed certain acts which were inconsistent with an intent to maintain a residence in Missouri and were consistent with an intent to become a resident of another state or states in the following particulars: (1) he made application to take the Virginia bar examination in 1963, in which he stated he was a resident of that state and took the examination and was admitted to the bar of that state; (2) while employed in Georgia he made application in January 1964 to take the Georgia bar examination in which he stated that he was a resident of that state, took the examination and was admitted to the bar of that state; (3) while employed in Washington, D. C., he was, on his application made in March 1965, admitted to the bar of the United States District Court for the District of Columbia; (4) in January 1964, intervenor purchased a 1964 model Oldsmobile in Georgia and was issued a Georgia certificate of title showing his address as 55 Pharr Road, N. W., Apt. E 106, Atlanta, Georgia; that on application of intervenor, supported by his oath that he had moved, a duplicate Georgia title for his automobile was issued to him on January 21, 1965, showing his address as 701 Union Trust Building, Washington, D. C., and in March 1965, a District of Columbia title was issued to him for this automobile showing his address as 2325 Pennsylvania

Avenue, N. W., Washington, D. C.; and that in December 1967, intervenor made application for a Missouri title to this automobile, in which he claimed and was allowed exemption from the Missouri use tax; (5) on May 12, 1967, intervenor applied for a Kentucky marriage license in which he stated that his address was Washington, D. C., and after his marriage on May 13, "* * * and before returning permanently to Missouri or establishing a residence anywhere else, he returned with his new wife to Washington, D. C., and established a household"; (6) intervenor did not file a Missouri income tax return in each of the years from 1962 to 1968, inclusive; (7) intervenor had interest income during the last ten years, but did not file a Missouri intangible property tax return for each of those years.

Intervenor admits he was physically absent from the state while attending law school, while working in New York City in 1961, and in Atlanta in 1962, during summer vacations, and while working in Atlanta and Washington after graduation from law school, but he denies that he intended to or did thereby abandon or lose his domicile or residence in Missouri and establish a residence elsewhere. He contends and argues that his residence in New York City in 1961 was for temporary summer employment as a law assistant in the New York County District Attorney's office in July and August; that his residence in Atlanta in 1962 was for temporary summer employment as a law clerk in the office of a law firm in June and July; that his residence in Atlanta after graduation from law school in June 1963 was for temporary employment for a term limited to one year beginning July 1, as a law clerk to the Honorable Elbert Tuttle, Chief Judge of the Fifth Circuit U. S. Court of Appeals; that his residence in Washington, from November 1964 to October 1967, was for temporary employment in a large law firm; that he sought and secured these temporary employments for the sole purpose of continuing his education and training by actual experience in the profession he intended to practice in his home state and that he at all times intended to return to Missouri, and that he did so, as intended.

He also contends and argues: (1) that his application to take the Virginia bar examination before the end of his senior year in law school was approved, not on the ground that he was a resident of that state, but on certification by the Dean and professors that he was a regularly enrolled student of the law school, a person of honest demeanor and good moral character, over the age of twenty-one years, a citizen of the United States, and that he would complete his degree requirements at the end of the school year, all as authorized by § 54-60, Code of Virginia (under these facts residence is not required); (2) that his application to take the Georgia bar examination made in January 1964 stated that he had resided at a given address in Atlanta for the preceding six months and would continue until he had resided there for twelve consecutive months, however, this statement was not inconsistent with his intent to maintain his Missouri residence but was consistent with his intent and was consistent with the fact that the law clerkship was temporary employment limited to one year and that his residence there for that purpose was temporary; that he is licensed in that state only as an inactive member of its bar; (3) that his application was based upon and his admission to the bar of the United States District Court for the District of Columbia was as a resident of Missouri and a member of the Missouri Bar, under the provisions of that court's Rule 93(e) which authorizes the admission on motion of a nonresident who is a member of the bar of another state; (4) that he purchased a 1964 Oldsmobile in Georgia, moved it from Georgia to Washington, D. C., and from there to Missouri and was issued titles by those jurisdictions showing his addresses, and was, on his application, granted exemption from the Missouri use tax, all as stated by relator, but that this exemption was authorized because, under the law, the tax was not applicable to this

automobile since it had been registered in his name in another state for more than ninety days before he applied for its registration in Missouri; (5) that his application for a Kentucky marriage license does state that his residence was Washington, D. C., and that he and his wife did live in his Washington apartment after the marriage and a honeymoon trip, but that they returned to his home in Mexico, saw his family and friends again, and she joined the First Presbyterian Church there before they went to Washington where they lived for only about three months (August, September and October 1967) before again returning to Mexico to live as planned; (6) that he did not file a Missiouri income tax return for each of the years 1962 to 1968 because he filed returns elsewhere and was not required by law to file a Missouri return for *all* these years, but was required to and did file Missouri returns for the years 1963 and 1967; (7) that he had interest income during the last ten years, but filed Missouri intangible tax returns only in the years 1968, 1971, and 1972, but not in the other years because not required by law to do so. He further contends and argues that these statements and acts were consistent with a purpose of furthering his training after law school by experience as a law clerk to an appellate judge in the federal court system and as an associate in one of the largest law firms in the nation's capital, and were not inconsistent with his intent always to return to Missouri, his home and permanent residence, to practice law and engage in partisan politics.

■ The question of residence or domicile is one of fact,[1] a question often difficult to determine. The words "residence" and "domicile" may be used interchangeably and relator and intervenor agree and suggest they should be so used in this case because they are synonymous insofar as they apply to the situation here presented. In re Ozias' Estate, supra, 29 S.W.2d at 243[5]; 28 C.J.S. Domicile § 2b, p. 7.

It has been said that residence is largely a matter of intention, to be determined not only from the utterances of the person whose residence is in issue but also from his acts and in the light of all the facts and circumstances of the case.[2]

■ Residence or domicile has been defined to be " * * * the place with which a person has a settled connection for certain legal purposes, either because his home is there, or because that place is assigned to him by law, * * *" and also as " '[t]hat place where a man has his true, fixed and permanent home and principal establishment, and to which whenever he is absent he has the intention of returning.' " In re Toler's Estate, supra, 325 S.W.2d at 759[4]. This definition of residence or domicile expresses the meaning of the word "resident" as it is used in Article IV, § 3, Constitution of Missouri; that section of our basic law does not mean and require actual, physical presence, continuous and uninterrupted for ten years.

There is no question about intervenor's "domicile of origin"[3] as that phrase is defined and referred to in In re Toler's Estate, 325 S.W.2d at 759. He was born in this state March 6, 1939, and was reared in his parents' home in Mexico, Missouri. Nor is there any serious question but that Mexico, Missouri, continued to be his domicile at least through the date he attained his majority in 1960. The question in this case is, therefore, not whether intervenor has acquired a Missouri residence, but whether after attaining his majority he

---

1. State on Inf. McKittrick v. Wiley, 349 Mo. 239, 160 S.W.2d 677, 686 [20, 22]; In re Ozias' Estate, Mo.App., 29 S.W.2d 240, 243 [11]; Barrett v. Parks, 352 Mo. 974, 180 S.W.2d 665, 666 [2].

2. In re Lankford's Estate, 272 Mo. 1, 197 S.W. 147, 148 [2]; Chomeau v. Roth,

230 Mo.App. 709, 72 S.W.2d 997, 999 [2]; In re Toler's Estate, Mo., 325 S.W. 2d 755, 760 [8].

3. 28 C.J.S. Domicile § 5, p. 10.

has, through the exercise of a choice, changed his domicile by abandonment of the former and acquisition of a new one.

█ The court said in In re Toler's Estate, supra, 325 S.W.2d at 759, that " * * * [a] person can have but one domicile, which, when once established, continues until he renounces it and takes up another in its stead. * * * In order to effectuate a change * * * it is necessary that there shall be actual personal presence in the new place and also the present intention to remain there, either permanently or for an indefinite time, without any fixed or certain purpose to return to the former place of abode."[4] The Supreme Court of Oregon, en banc, said in Elwert v. Elwert, 196 Or. 256, 248 P.2d 847, 853 [9] that "[t]he original domicil is favored and where the facts are conflicting, the presumption is strongly in favor of an original or former domicil as against an acquired one." In Hall v. Schoenecke, supra, 31 S.W. at 97, it was said that: "A temporary absence of a person from his usual residence through a series of years does not necessarily cause a loss of such residence. Whether a change was effected in one case depends upon the intention with which the removal from the former residence was made."[5]

Gates v. Commissioner of Internal Revenue, 199 F.2d 291 (U.S.Ct. of App., 10th Cir., 1952), and Gallagher v. Board of Supervisors of Elections, 219 Md. 192, 148 A.2d 390 (1959), two cases from other jurisdictions, involve many facts quite similar to those in our case and are persuasive in their application of the above rules of law to those facts.

Gates v. Commissioner of Internal Revenue, supra, involved a tax deficiency assessed against the taxpayer for the year 1944 by the Internal Revenue Service on the theory that the taxpayer residing in Louisiana was not entitled to utilize that state's community property law in reporting his income, because he was not a resident of that state but was a resident of Colorado. The taxpayer was reared in Colorado where his father owned a rubber company. He attended college in Massachusetts and California and upon graduation in 1943 took a job with Firestone Rubber Company in Baton Rouge for the purpose of learning the synthetic rubber business and with the intent to return to Colorado when he determined that he had secured sufficient experience to assist in the management of the family business. He resided in Baton Rouge from 1943 to 1946. He married after going to that city

4. This principle may be well illustrated by distinguishing the facts in the instant case from the facts in the recent case of State ex rel. Gralike v. Walsh et al., 483 S.W.2d 70 (Decided July 14, 1972, Mo., en banc) involving the candidacy of Brick Storts, III for the Democratic nomination for Senator from the First Senatorial District. Gralike, like this case, involved whether the candidate met durational residence requirements. In Gralike, the relator sought to show that the candidate attacked had not acquired a new residence. In our case, relator seeks to show that the candidate attacked has acquired a new residence. In Gralike, the facts were that the candidate had the required intent but that he did not have the physical presence in the new district for the required time to abandon the old and acquire the new residence. In our case, the facts are that the candidate was physically present in another state, but that he did not have the intent thereby to abandon the old residence and acquire the new. In a few words, neither candidate met the test for abandoning an old and acquiring a new residence: that there must be not only bodily *presence* in the place, but also a presently exercised *intention* to abandon the old and establish the new. See also: Chomeau v. Roth, 230 Mo.App. 709, 72 S.W.2d 997, 999 [3, 4]; Barrett v. Parks, 352 Mo. 974, 180 S.W.2d 665; Hall v. Schoenecke, 128 Mo. 661, 31 S.W. 97; State v. Snyder, 182 Mo. 462, 517–520, 82 S.W. 12.

5. See also: State ex rel. Lowe v. Banta, 71 Mo.App. 32, 41; Barrett v. Parks, supra; District of Columbia v. Murphy, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329; Gates v. Commissioner of Internal Revenue, 199 F.2d 291, 293 (10th Cir.); Gallagher v. Board of Supervisors of Elections, 219 Md. 192, 148 A.2d 390.

and he and his wife lived there for a little over two years, did their banking there, became members of that city's country club, and were active in community affairs. He admitted that he had always considered Colorado his permanent home and intended to return to that state to work in the family business. The court held that he had not acquired a legal residence in Louisiana; that he retained his Colorado residence despite his absence for several years and his attachments to Louisiana.

Gallagher v. Board of Supervisors of Elections, supra, involved an attack upon the residence qualification of Theodore McKeldin to be a candidate for the office of mayor of Baltimore. The law required that he be a resident for ten years before election. Mr. McKeldin was born and reared in Baltimore, practiced his profession there, and had previously served as its mayor. After that service, he was elected· governor of the state and moved to Annapolis. A statute required that the chief executive reside in the state capital. The four-year term he resided in the capital was within the ten-year period next before he sought election again as mayor of Baltimore. During his residence in Annapolis he registered to vote there, listed Annapolis as his residence for tax reporting purposes, became a nonresident member of a Baltimore country club, and had his motor vehicle registration and operator's license changed to his Annapolis address. However, he continued to maintain all of his accounts, associations, social relations and membership in organizations in Baltimore, and indicated in communications with friends that he intended to return to that city at the end of his term as governor, and did so. The court discussed the rule that in order to abandon an old and acquire a new residence there must be, not only bodily presence in the place, but a presently exercised intention of establishing the new residence. The court held Governor McKeldin did not intend to abandon his domicile in Baltimore, that he did not abandon it as a matter of law, and that

he met the residence qualification for mayor of his home city.

■ There is substantial evidence that intervenor did not abandon his residence in Missouri and acquire a new one; that although he lived for brief periods in Virginia, Georgia, and the District of Columbia during the ten years next before the 1972 general election and made statements which, on the surface, were consistent with an intent to choose a new residence, intervenor intended to and did continuously maintain his domicile of origin. In fact, the evidence, independent of and apart from intervenor's own testimony before this court, is overwhelming that no matter where he was during these years, he always intended to return to his home in Mexico to establish an office for the practice of law and that he had an abiding interest in the Republican party and intended to take an active part in Missouri politics in connection with his law practice. This evidence came from friends and associates of Mexico, St. Louis, Atlanta, and Washington in the form of their testimony, their letters and other communications, and from records, and relates to statements made, and acts and events which occurred before intervenor's residence was questioned.

He registered to vote in Mexico in Audrain county in June, 1960, and voted in this county in 1960, 1964, 1966, and each year thereafter through 1971.

In December, 1960, while attending law school in Virginia, he registered with the clerk of this court as a law student in which he stated his permanent residence was Mexico. In his application to take the June 1963 Missouri bar examination, filed with our clerk in April, 1963, he again stated his permanent residence as Mexico. In this application he stated that he planned to serve during the year after graduation as law clerk to the Chief Judge of the Fifth Circuit U. S. Court of Appeals. The Missouri Twelfth Circuit Bar Committee certified by this court in 1960, and again in 1963, that intervenor was a bona fide resident of

Audrain county. He took the examination in 1963 and was admitted to the bar of this court and thereby immediately became a member of The Missouri Bar. He has each year since admission paid the annual Missouri bar enrollment fee as provided by Supreme Court Rule 6, although not required to do so while employed outside the state. He became a member of the First Presbyterian Church of Mexico when a child and his membership and active interest in that church has continued unabated through the years since reaching his majority as evidenced by his attendance when at home and correspondence with its pastor. In 1964, 1965, 1966, and 1967, he made contributions to the building fund of this church in accordance with his prior pledge. He has continuously through the years since reaching his majority maintained his bank account in a Mexico bank. His Social Security and Selective Service records, begun many years ago, show his permanent residence as Mexico, Missouri. The testimony of a brother lawyer in Mexico, and a letter from his pastor in 1966, confirm his expressed interest in dove hunting in central Missouri and confirm the fact that he returned to and was usually in Audrain county to participate each year in the opening day of the bird hunting season. He purchased Missouri hunting and fishing licenses in 1962, 1964, and each year thereafter through 1968. While dove hunting and on other occasions with a brother Mexico lawyer during these years he, on innumerable occasions, discussed his plans to practice law in Mexico and their plans for joint action and effort to revive the Republican party in Missouri and Audrain county in particular. There is evidence that he made contributions to the Missouri Republican Party during these years. Records of his dentist in St. Louis, dating from 1952 and ending with the dentist's retirement in 1965, show that intervenor appeared there for treatment one or more times each year during that period. While attending school out of the state and, after finishing his formal education, while employed out of the state he returned to his home during the Thanksgiving, Christmas, and other holiday periods and during summer vacations. Letters to intervenor from Chief Judge Tuttle in 1962 and 1964 support other evidence that his employment in Georgia from July 1963 through June 1964 was for that court year and was understood to be temporary. That he did in fact leave Georgia and return to Missouri in July 1964 is further evidence that his employment as a law clerk in Atlanta was considered by him to be a continuation of his education, that it was temporary only, and was inconsistent with an intent to acquire a residence there to the exclusion of his permanent residence in Missouri.

The fact that he made a statement to the Georgia Board of Law Examiners that he had resided in that state for six months and would continue to live there until his residence was for twelve consecutive months is some evidence that he intended to abandon his Missouri residence, but it is not conclusive of that issue and, as indicated, we have found that it is outweighed by evidence to the contrary.

Intervenor postponed reporting for his employment with the Washington law firm until November, 1964, so that he could continue his efforts in this state, begun that summer, on behalf of the Republican nominee for one of Missouri's seats in the United States Senate. In that political campaign he made a friend who described for the court intervenor's intense interest in politics and his consuming desire and intent to return to Missouri to practice law and engage in state politics as soon as he completed his employment with the Washington firm of Covington and Burling.

The senior member of that firm, Mr. Edward Burling, Jr., testified that he interviewed intervenor for employment with the firm in 1964, and that it was understood at the time, and thereafter, that although the firm would be glad to consider intervenor for permanent employment in view of his outstanding record in one of

the best law schools, intervenor was interested only in temporary employment for the purpose of gaining experience, a sort of internship, and that he intended to return to Missouri to practice law.

The Honorable Paul F. McArdle, a Judge of the Superior Court of the District of Columbia, who was, before his appointment to the bench, a member of the Covington and Burling firm, told the court that while he was still with that firm he became interested in intervenor and his work with the firm, that they worked together and visited socially almost weekly during those years, that he knew from his many conversations with intervenor about his plans for his career in the legal profession and in partisan politics, and that intervenor intended to return to Missouri to practice law and engage in state politics whenever he felt that he had acquired the experience he sought in his employment with this firm.

Carolyn Reid Bond, wife of intervenor, testified that they met in Atlanta in the spring of 1964 and were married in May, 1967, in Lexington, Kentucky; that she visited him and his family in Mexico, Missouri, several times between those dates; that in June, after the marriage, they were in Mexico and she joined his church, the First Presbyterian, in that city, because it was their intent to return there to establish their home after he completed his work with the Washington law firm; that they left their wedding presents packed and did not take them to Washington because they knew they would be returning to Missouri to live within three or four months; that they have resided in this state continuously since returning to Mexico in the fall of 1967.

Intervenor executed his last will and testament in May, 1967, in which he stated that he was a resident of Missouri.

Intervenor admits relator's allegation that he did not file a Missouri income tax return or a Missouri intangible tax return for each of the last ten years, but whether or not he was required by law to do so is not an issue in this case and we do not decide that question. The only issue in this case is residence vel non. His admission that he did not file tax returns in Missouri for each of these years is admissible on this issue and may be considered as some evidence of intent to abandon his Missouri residence and acquire a new one, but it alone or combined with the other evidence of that intent, is not conclusive of that issue and, as indicated, we have found that it is light compared to the great weight of evidence to the contrary.

Because we have ruled that intervenor meets the residence requirements of Article IV, § 3, Constitution of Missouri, we need not, should not, and do not rule the question of whether these durational residence requirements violate the First, Fifth and Fourteenth Amendments to the Constitution of the United States as contended by intervenor.

FINCH, C. J., SEILER and HOLMAN, JJ., and JENSEN, Special Judge, concur; DONNELLY, J., dissents in separate dissenting opinion filed; BARDGETT, J., dissents in separate dissenting opinion filed; MORGAN, J., not participating.

DONNELLY, Judge (dissenting).

I have sworn, as a Judge of this Court, to support the Constitution of the State of Missouri (Art. VII, § 11).

The Constitution of the State of Missouri requires that the Governor shall have been "a resident of this state at least ten years next before election." (Art. IV, § 3).

On or about January 10, 1964, Intervenor represented to the Superior Court of Fulton County, Georgia, that he was then a resident of Fulton County, Georgia. On July 26, 1972, Intervenor represented to this Court that he was a resident of Missouri throughout the year 1964. I am unable to reconcile the two positions.

Intervenor lived in Washington, D. C., and worked for a private law firm there from November, 1964, through October, 1967. He married his wife in Lexington, Kentucky, on May 13, 1967, and lived with her in Washington, D. C., from June through October, 1967.

Intervenor was born March 6, 1939, in St. Louis, Missouri, and spent his youth, through the first two years of high school, in Mexico, Missouri. He then attended Deerfield Academy, Deerfield, Massachusetts. He then attended Princeton University. He then attended the University of Virginia School of Law. He then served as a law clerk in Atlanta for a federal judge. After a brief period in Missouri, he served a law firm in Washington, D. C., for nearly three years. He then returned to Mexico, Missouri, to practice law "and enter politics" in late 1967.

Intervenor explains away all this by asserting that Missouri is "the place where he at all times intended to permanently reside."

I must conclude, from all the evidence, that, except for brief intervals, Intervenor physically lived outside Missouri from the Fall of 1954 until the Fall of 1967. I do not believe this type of "sporadic residence" is what the people of Missouri had in mind when they adopted Art. IV, § 3, Constitution of Missouri.

I dissent.

BARDGETT, Judge (dissenting).

I respectfully dissent and believe that it is my obligation and responsibility as a judge of this Court to set forth the basis of a dissent in cases decided by the Supreme Court when sitting en banc.

Art. IV, § 3, Constitution of Missouri 1945, provides: "The governor shall be at least thirty years old and shall have been a citizen of the United States for at least fifteen years and a resident of this state at least ten years next before election."

The issue here is whether or not intervenor was a resident of Missouri continuously from November 7, 1962, for only then would he have been a resident of Missouri for the ten years next preceding November 7, 1972, the date of the general election this year.

The first question in this case is whether or not intervenor chose to and did become a citizen and resident of Georgia while he was living there.

On this issue this Court has received into evidence documents that all parties, including intervenor, have stipulated and agreed to as authentic. One of these documents is an application to the Superior Court of Fulton County, Georgia, which was completed and signed by intervenor petitioning that court to certify him to the State Board of Law Examiners of Georgia as approved to take the Georgia Bar examination. This, of course, was in order to become licensed to practice law in Georgia. It was not necessary for intervenor to become a licensed attorney in Georgia to perform his duties as clerk for a judge of the U. S. Court of Appeals. This is obviously correct because intervenor did not receive his Georgia law license until after he completed his one-year clerkship.

Admission to the practice of law in Georgia is governed by the statutes of that state. On April 9, 1963, the Georgia legislature repealed certain sections of the law relating to the right to practice law in Georgia and enacted in lieu thereof Ga. Code, § 9–103 (House Bill 386, Act No. 366, Ga.Laws 1963, Vol. 1, pp. 458–460), which provides as follows:

"(a) Any citizen . . . who meets the educational and residence requirements provided in this section may be admitted to the practice of law provided such citizen has successfully passed an examination as provided in this Chapter.

[Subsections (b), (c), and (d) are not relevant.]

"(e) Notwithstanding any other statute or rule of law, any graduate of a law school which is accredited by the American Bar Association shall be permitted, upon satisfactory proof of compliance with all pertinent requirements of this section other than the residence requirement, to apply for and to take the examination as provided in this Chapter; Provided, that no such applicant shall be admitted to the practice of law until such applicant shall have been a bona fide resident of the State of Georgia for a period of 12 consecutive months immediately preceding the date of such admission, even though such applicant shall have successfully passed such examination.

"(f) Any applicant who shall, pursuant to subsection (e) of this section, apply to take the examination and to be admitted to the bar as provided in this Chapter shall file with his application a certificate of a member of the bar of the Supreme Court of Georgia reading in substance as follows: 'I do hereby certify that I am a member of the bar of the Supreme Court of Georgia in good standing; that I know the above applicant personally; that I know of my personal knowledge that said applicant is a graduate of a law school accredited by the American Bar Association and is now a bona fide resident of the State of Georgia; and that I verily believe that said applicant intends to and will continue such residence continuously hereafter until _____, at whch time said applicant will have been a bona fide resident of the State of Georgia for a period of 12 consecutive months.' "

The only way that intervenor could have been allowed to take the Georgia Bar examination and thereafter be admitted to the Georgia Bar under the Georgia statutes was to be a citizen and bona fide resident of the State of Georgia at the time he applied to take the Georgia Bar examination and for a period of 12 months immediately prior to receiving a license to practice law in Georgia.

In January of 1964 intervenor admittedly completed and signed and submitted an application to the Superior Court of Fulton County, Georgia, in which the following questions, answers and assertions appear:

"2.

"That the home address of applicant is: 55 Pharr Rd, NW, E–106, Atlanta 5, Georgia.

"3.

"That applicant is a citizen of the State of Georgia, and has resided in Georgia at above address, for 6 months next preceding the filing of this application. Prior to such residence in Georgia, applicant resided at: 14 S. Jefferson Road, Mexico, Missouri. Attached hereto as Exhibit 'A' is a certificate of a member of the Bar of the Supreme Court of Georgia certifying that applicant is a bona fide resident and citizen of Georgia for at the time of this application as required by Ga.Code Sec. 9–103(e) and will continue such residence until said applicant has been a bona fide resident of the State of Georgia for 12 consecutive months.

"4.

"That applicant is a resident of this County. . . . "

Pursuant to Ga.Code § 9–103(f), *intervenor* filed with his application a certificate of a member of the Bar of the Supreme Court of Georgia by which the member of the Bar of the Supreme Court of Georgia certified, ". . . that I know of my personal knowledge that said applicant is a graduate of a law school accredited by the American Bar Association and is now a bona fide resident of the State of Georgia; and that I verily believe that said applicant intends to and will continue such residence hereafter until July 1, 1964, at which time said applicant shall have been a bona fide resident of the State of Georgia for a period of 12 consecutive months."

On the basis of the foregoing application and certification, together with other data not pertinent to the issue of residency in Georgia, there was an order entered by a judge of the Superior Court, Atlanta Judicial Circuit, Fulton County, Georgia, on April 20, 1964, whereby the application of intervenor to take the forthcoming Georgia Bar examination was officially approved by that court.

Intervenor successfully passed the Georgia Bar examination sometime between April 20, 1964, and June 8, 1964, for on June 8, 1964, the State Board of Bar Examiners certified to the Superior Court of Fulton County, Georgia, Atlanta Judicial Circuit, that intervenor had passed that examination. However, as of June 8, 1964, intervenor had not yet been a bona fide resident of the State of Georgia for 12 consecutive months and, consequently, he could not yet be admitted to the practice of law in that State. Ga.Code § 9–103(e). His full 12-months' bona fide residency in Georgia would not occur until about July 1, 1964.

On August 3, 1964, the record of the Fulton County, Georgia, Superior Court, Atlanta Circuit, stipulated to by intervenor as being authentic, shows that intervenor presented his application for admission to the Georgia Bar, together with other necessary documents to that Court. The order and judgment of that Court recites the filing of those documents "with the Clerk of the Superior Court of Fulton County, it being the County of the applicant's residence", and thereupon ordered that intervenor be admitted to the practice of law in Georgia upon his taking the required oath. On that same date intervenor did take the required oath to, inter alia, support and defend the Constitution of the United States and the Constitution of the State of Georgia, whereupon, his right to practice law in Georgia became final.

The order of the Superior Court of Fulton County, Georgia, granting the right to practice law in Georgia to intervenor constitutes a judgment of that Court.

During the early part of 1964, intervenor made arrangements to practice law with a Washington, D. C., law firm in Washington, D. C., and later arranged to delay his arrival in Washington, D. C., until early November of that year because he was working in a political compaign in Missouri, on behalf of two candidates seeking the office of U. S. Representative in Congress and that of U. S. Senator. In that year he did vote in Mexico, Missouri, at the August primary and November general elections. He thereafter lived in Washington, D. C., from November 1964 until November 1967. During this period he returned to the home of his parents in Mexico, Missouri, from time to time particularly for the opening of dove hunting season in September of a year and holidays.

He first registered to vote in Audrain County, Missouri, (Mexico) when he was 21 years old and his residency in Missouri at that time is not questioned. He voted in the primary election of 1960. He did not vote in any elections in Missouri in 1961, 1962, 1963, or 1965. In addition to voting in Missouri in the August primary and November general elections in 1964, he voted in Audrain County, Missouri, in the primary and general elections of 1966 and in the city general election and a special election in Mexico in 1967.

The subsequent years of 1968 to present are not relevant for he was unquestionably a resident of Missouri again beginning at the latest in November 1967 when he and his wife returned to Missouri.

On May 12, 1967, intervenor and his wife applied for and received a marriage license in Fayette County, Kentucky. At that time intervenor was practicing law and living in Washington, D. C. The register of marriage, stipulated to as being authentic, and executed by intervenor under oath, contains, inter alia, the following: "Full names of parties, Husband Christopher Bond" "Husband's Place of Birth St. Louis Mo," "Residence Washington D.C."

The stipulation entered into by the parties, including intervenor, with respect to the filing of income tax returns for the years 1963 through 1967 is relevant and material to the question of residency insofar as the acts of intervenor in the filing of such returns is consistent or inconsistent with residency in Missouri or somewhere else. However, it must be considered in the light of the Missouri income tax laws and consideration should be given to intervenor's knowledge or lack of knowledge of such laws because the relevancy of this evidence is on the issue of intent with respect to residency.

Sec. 143.010, subd. 1, RSMo 1969, became law in 1959. H.B. 395, Laws of Mo. 1959, 70th General Assembly of Mo. It provides:

"1. Every single individual, a citizen or resident of this state having a gross income in excess of one thousand two hundred dollars, and every married couple, citizens or residents of this state having a gross income in excess of two thousand four hundred dollars, shall file an income tax return or returns and pay a tax upon net income received, from all sources during the preceding year in excess of the exemptions herein provided.

[2. sets forth rate of tax—not relevant to this case.]

"3. Every individual, not a citizen or resident of this state, shall file an income tax return and pay a tax at the rate prescribed in subsection 2 of this section on the net income received from all sources within this state during the preceding year in excess of the exemptions.

[4. not relevant.]"

Rather than to summarize or paraphrase the stipulation entered into by intervenor and filed in this case, fairness indicates the stipulation relating to the filing of income tax returns be set forth as filed. It speaks for itself and is as follows:

"1. Intervenor signed, and in 1964, filed, a 1963 Missouri income tax return in the State of Missouri and a 1963 Georgia income tax return in the State of Georgia; during the calendar year 1963, Intervenor had unearned taxable income in excess of $2,400.00 from trusts whose situs was in Missouri and which were administered by a Missouri Trustee; he also had other unearned taxable income during said calendar year; income and deductions were allocated on each of said returns on the basis of the time that Intervenor lived in each of said jurisdictions during said calendar year and the tax was paid to each of said taxing authorities on the same basis; that on the tax return he filed with the State of Missouri, Intervenor stated that his address was 14 S. Jefferson Road, Mexico, Missouri, that he indicated on said return that he had resided in the State of Missouri for less than twelve months in 1963, to-wit, for six months; that on the tax return he filed with the State of Georgia, he stated his address was 55 Pharr Road, Atlanta, Georgia.

"2. Intervenor signed, and in 1965 filed, a 1964 Georgia income tax return in the State of Georgia, and a 1964 District of Columbia income tax return in the District of Columbia; that attached to the Georgia income tax return was a Form W-2 of the United States Treasury Department, Internal Revenue Service, showing Intervenor's employment by the Administrative Office of the United States Courts, Supreme Court Building, Washington, D. C., and giving his address as 14 South Jefferson Road, Mexico, Missouri; during the calendar year 1964, Intervenor had unearned taxable income from trusts whose situs was in the State of Missouri and which were administered by a Missouri Trustee; that he also had other unearned taxable income during said year; that income and deductions were allocated on each of said returns on the basis of the time that Intervenor lived in each of said jurisdictions during said calendar year and the tax was paid to each of said taxing authorities on the same basis; that on both returns his address was given as 2325 Pennsylvania Avenue, N.W., Washington,

D. C.; that on the Georgia return, he stated that he was not a resident of the State of Georgia during the entire taxable year, but that the dates of his residence in Georgia were from July 1, 1963 through October 31, 1964; that the District of Columbia return indicates that he moved into the District of Columbia on November 1, 1964; that Intervenor filed no Missouri state income tax return for the year 1964 and has paid no income tax to the State of Missouri on any of his income for said year.

"3. During the calendar years 1965 and 1966 when he was living in Washington, D. C., Intervenor had unearned taxable income from trusts whose situs was in Missouri and which were administered by a Missouri corporate Trustee in excess of $2,400.00 for each of said years; that the Intervenor also had unearned taxable income during each of said years from other sources; that the Intervenor signed and filed a District of Columbia tax return for the calendar years 1965 and 1966 in which he reported all of the aforesaid income and paid the tax thereon to the District of Columbia; that in each of said returns, he stated that his address was 2325 Pennsylvania Avenue, N.W., Washington, D. C.; that the said Intervenor filed no Missouri income tax return for the calendar year 1965 or in 1966 or for any fiscal year including all or part of said years, and has paid no income tax to the State of Missouri on any of his income for said year.

"4. Intervenor signed, and in 1968 filed, a 1967 District of Columbia income tax return in the District of Columbia, and a 1967 Missouri income tax return in the State of Missouri; during the calendar year 1967, Intervenor had unearned taxable income in excess of $2,400.00 from trusts whose situs was in Missouri and which were administered by a Missouri Trustee; that he also had other unearned taxable income during said calendar year; that income and deductions were allocated on said returns on the basis of the time that Intervenor resided in said jurisdictions during said calendar year and the tax was paid to

said taxing authorities on the same basis; that in the tax return filed in the District of Columbia, Intervenor's address is given as 1515 Kentucky Road, Mexico, Missouri; that the said return indicates that he moved out of the District of Columbia in 1967 and his dates of residence in D.C. were from January 1, 1967 to October 30, 1967; that Intervenor's Missouri income tax return for said year indicates that he did not reside in Missouri during the entire twelve months of said calendar year, but for only two months thereof."

With respect to intervenor's knowledge of the Missouri law relating to the filing of Missouri income tax returns, he testified before this Court:

"Q. All right. Now, you were aware that the Missouri tax law requires that all residents of Missouri file Missouri income tax if their income is over a certain number of dollars, are you not?

"A. Yes."

And at another point in intervenor's testimony, the following appears:

"Q. Were you familiar with the language of the Missouri income tax statute which says that all residents of Missouri must file an income tax return if their income exceeds $1200, as a single person, and $2400, as a married person?

"THE WITNESS: I am aware of it, and I have read the Missouri income tax laws."

With respect to the application to take the Georgia Bar examination, intervenor testified in this Court, inter alia, as follows:

"Q. Mr. Bond, on your Georgia application to take the bar exam, you made a statement that you were a resident of Georgia; is that correct?

A. Yes.

Q. And that you were a resident for some period of time and would remain a resident for a full year?

A. Yes, I said I was living in the state of Georgia, and I would live in the state of Georgia for a period of 12 consecutive months, and that I was at 55 Pharr Road during that year.

Q. I understand your answer, but isn't it true, Mr. Bond, that that application didn't contain the word 'live,' it said residence, asked what your residence was at that time?

A. Yes, that is what that said.

Q. Was that sworn to or not?

A. I don't recall. I know that there is the application. It doesn't have an attestation on it, but if I said it on the application, it's true. It doesn't matter whether it is sworn or not. It is true.

Q. It is true that that was your residence?

A. What I said on there is true."

With respect to the status intervenor claims to have maintained while in Georgia and Washington, D. C., he testified, inter alia, as follows:

"Q. Did you, as a resident of Missouri, file a Missouri return during the year 1964?

A. No.

Q. And you are claiming that you were a resident of Missouri during that period?

A. I am claiming that I was domiciled in the State of Missouri."

State ex rel. Sathre, Atty. Gen., v. Moodie et al., 65 N.D. 340, 258 N.W. 558, involved the question of whether the governor-elect of that state, Mr. Moodie, had been a resident of North Dakota for the five years next preceding his election. The North Dakota Supreme Court heard the evidence itself and held that Mr. Moodie had lost his North Dakota residence by establishing himself as a legal resident of Minneapolis, Minnesota, for a period of what appears to be about 16 months of the first part of the requisite five-year period. The court ousted Mr. Moodie from the position of governor-elect of North Dakota even though the court found that ". . . Mr. Moodie did intend to return to the state of North Dakota some time. His testimony, his statements to the witnesses in Minneapolis, and the fact that he did return, all indicate an intention to return some time. On the witness stand his truthfulness was apparent to everyone. He answered all questions without hesitation when the answers were unfavorable as well as when they were favorable." 258 N.W. loc. cit. 565.[1]

A person can have but one legal residence at any given time. State on inf. Reardon v. Mueller, Mo.App., 388 S.W.2d 53.

In the case of In re Toler's Estate, Mo., 325 S.W.2d 755, the court said, loc. cit. 759–760 [6, 7]: "In order to effectuate a change of domicile it is necessary that there shall be actual personal presence in the new place and also the present intention to remain there, either permanently or for an indefinite time, without any fixed or certain purpose to return to the former place of abode. The fact of physical presence and the intention must concur, and if they do so, even for a moment, the change of domicile takes place. Nolker v. Nolker, Mo.Sup., 257 S.W. 798; Phelps v. Phelps, 241 Mo.App. 1202, 246 S.W.2d 838; Barth v. Barth, Mo.App., 189 S.W.2d 451; In re Ozias' Estate, Mo.App., 29 S.W.2d 240; Finley v. Finley, Mo.App., 6 S.W.2d 1006; Hays v. Hays, 221 Mo.App. 516, 282 S.W. 57. While physical presence is required, it

1. This case is not cited for procedural authority with respect to the right of persons who have been elected to a constitutional office in this State to continue to hold such office.

is not necessarily essential that there be established a home, in the generally accepted meaning of that term, in a particular building. 'Thus where a man, never settling down in one place, lives at hotels or clubs in a certain place, he may nevertheless acquire a domicil there.' Beale, The Conflict of Laws, § 16.3; Restatement, Conflict of Laws, § 16."

At 760 [8]: "The question of intent is to be gathered largely from the acts and utterances of the person whose domicile is under question, In re Lankford's Estate, 272 Mo. 1, 197 S.W. 147, and the declarations of the person made before, at, and after the time the domicile is in dispute may be considered. Memphis Bank & Trust Co. v. West, Mo.App., 260 S.W.2d 866."

And at 761: "In Restatement, Conflict of Laws, § 22, it is stated that 'If the new dwelling-place is acquired with the necessary intention of making it a home, it becomes a domicil of choice although there may be a special . . . motive in making the change.' Under this statement, in what is designated as an 'illustration,' is the following: 'A changes his dwelling-place for the purpose of diminishing his taxes or avoiding the payment of a debt or for the purpose of securing a divorce. He intends, however, to make the new place his home. A's domicil is changed.' See also Beale, The Conflict of Laws, § 22.1, and also, Stevens v. Larwill, 110 Mo.App. 140, 84 S.W. 113. Mr. Toler was a lawyer and a graduate of Vanderbilt University School of Law. It can therefore be reasonably assumed that he appreciated and understood the legal significance of his utterances concerning residence, not only for tax purposes but for all purposes."

Intervenor represented to the Georgia Court that he was a "bona fide resident" of Fulton County, Georgia. In Alburger v. Alburger, 138 Pa.Super. 339, 10 A.2d 888, 890, the court held, " 'Domicile' is a matter of intention; 'residence' is a physical fact, and the term 'bona fide residence' means residence with domiciliary intent, i. e., a home in which the party actually lives." See also Black's Law Dictionary, Rev. 4th Edition, p. 224.

Whatever may be the similarities or distinctions between "domicile" and "residence" as those terms appear in the case law of this State, it seems clear that if intervenor did become a "bona fide resident" and "citizen" of the State of Georgia, he did, by that act, relinquish his Missouri legal residence, for "citizenship" and "bona fide residency" encompasses the whole of residence and domicile.

The Court, in this rather unusual case, and due to the exigencies of time and the importance of the issues to intervenor and the people of Missouri, has itself heard the evidence. The effect of this procedure is that the Court is both judge and jury and must resolve mixed questions of fact and law presented in the case.

Intervenor arrived in Atlanta, Georgia, around July 1, 1963. It was not necessary that he be admitted to the practice of law in Georgia in order to perform his duties as a clerk for a judge of the U. S. Court of Appeals. He was first in his law class at the University of Virginia Law School. He had clerked in a law firm in Atlanta, Georgia, during the summer of 1962. On January 10, 1964, he freely and of his own choosing represented to the Superior Court of Fulton County, Georgia, that he was at that time a citizen and resident of the State of Georgia and had been such for the previous six months, and that he was a resident of Fulton County, Georgia. He supported his application with a certificate of a member of the Bar of the Supreme Court of Georgia attesting to the fact that intervenor was a bona fide resident and citizen of Georgia at the time of the application to take the bar exam and would continue as such until he had been a bona fide resident of Georgia for 12 consecutive months. "Bona fide" is a well-recognized and understood term, particularly to a lawyer. "Bona fide" is defined in Black's Law Dictionary (Revised 4th Edition, p. 223), as "In or with good faith; honestly,

openly, and sincerely; without deceit or fraud . . ." Webster's Third New International Dictionary gives substantially the same definition of that phrase. The phrase is used in our own rules for admission to the Bar of Missouri. S.Ct.Rule 8.-13 states: "No person shall be admitted to practice law in this State unless he is a bona fide resident of this State, or a resident of an adjoining county in an adjacent state who in good faith intends to maintain an office for the full-time practice of law in this State." The right to practice law in a given state is a valuable right. Intervenor sought and obtained this right in Georgia based, in part, on his representations to the Georgia court that he was a citizen and bona fide resident of the State of Georgia, and the Georgia court believed him. These applications and supporting certifications constituted a solemn declaration freely made and resulted in intervenor being a citizen and resident of Georgia.

In this Court intervenor testified that what he said in his application to take the Georgia Bar examination and to be admitted to the practice of law in Georgia was true. If the assertions were true when made, as intervenor has testified, and which I believe to be true, then any question of intent on the part of the intervenor to constitute himself a citizen and bona fide resident of Georgia at the time he was in Georgia is concluded and there can exist no conflict with reference to his then existing intent regarding citizenship and residence in Georgia. The conclusion that he did thereby become a citizen and bona fide resident of Georgia is inescapable and follows directly from his own testimony.

Since a person can have only one bona fide residence at any given point in time, the very act of becoming a citizen and bona fide resident of Georgia constituted the relinquishment of his prior status as a Missouri resident. In re Toler's Estate, Mo., 325 S.W.2d 755.

The subsequent action of intervenor in the filing of income tax returns as set forth in the stipulation is consistent with an intent that Georgia be his residence for the last six months of 1963 and until October 31 of 1964. It is also consistent with his application to take the Georgia Bar exam and to be admitted to practice law in Georgia. The non-filing of Missouri income tax returns for the years 1964, 1965, and 1966 is consistent with intent to maintain residency outside Missouri and in the District of Columbia. It is inconsistent with Missouri residency during those years.

Intervenor's action in filing income tax returns for 1967 in the District of Columbia and Missouri wherein he allocated income to the District of Columbia for the first ten months and to Missouri for the last two months is consistent with intervenor being a resident of the District of Columbia for those first ten months and is consistent with an intent on the part of intervenor to again establish residency in Missouri beginning in November 1967.

Intervenor's certification on the application for a marriage license in the spring of 1967 that his residence was Washington, D. C., is a statement by intervenor that is consistent with an intent that such place was his residence at that time and is inconsistent with Missouri residency at that time.

I have weighed carefully the testimony and evidence of intervenor and others that he always intended to return to Missouri, and other testimony, oral and documentary, offered in support of intervenor's contentions that he always intended Missouri to be his residence, the substance of which is set forth in the majority opinion, and I believe he, intervenor, did intend to return to Missouri at some indefinite future time. However, the admittedly authentic documentary evidence and intervenor's testimony in this Court convinces me that intervenor did intentionally become a citizen and bona fide resident of Georgia at the times that he so stated to the Georgia court that such was his status, and that after leaving Georgia in 1964 he became a resident of

the District of Columbia and thereafter he re-established residency in Missouri, and consequently he will not have been a resident of the State of Missouri for ten years next before November 7, 1972.

For the foregoing reasons I respectfully dissent from the majority opinion in this case.